IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| STEPHANIE MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:11cv41-MHT |
| | ) | (WO) |
| CHILTON MEDICAL CENTER and | ) | |
| SUNLINK HEALTH SYSTEMS, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION AND ORDER</u>

Plaintiff Stephanie Mims brings this employment-discrimination lawsuit against defendants Chilton Medical Center, LLC, and SunLink Health Systems, Inc., charging them with sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e-2000e-17.[*] Jurisdiction is proper under 42 U.S.C. § 2000e-5(f)(3).

---

[*] While the record does not appear to indicate, Chilton Medical's attorney clarified at the pretrial conference that it is an LLC.

Chilton Medical and SunLink Health move for summary judgment on Mims's sexual-harassment claim on the ground that she has failed to establish a hostile-work environment and on the retaliation claim because Mims's termination was unrelated to her allegations of sexual harassment.  In the alternative, SunLink Health contends that it is entitled to summary judgment because it is not an integrated employer with Chilton Medical.  For the reasons given below, the summary-judgment motions will be denied.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that

party.   Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Mims first met Bart Walker at the Russell Do-It-Center where she worked as a cashier.  While engaging in small talk at the cashier's counter, Walker offered some unsolicited advice: Mims should apply for a job at Chilton Medical, a hospital where Walker worked as a supervisor.  Walker subsequently returned and gave Mims an employment application.  Mims applied to work at Chilton Medical and was interviewed by Human Resources Director Joann Bartlett.

In March 2008, Mims was hired as a housekeeper in Chilton Medical's Dietary/Environmental Health Department, performing basic functions such as pulling trash and linen, sweeping, mopping, and dusting; she also worked in Chilton Medical's kitchen.  Walker served as

her supervisor in the housekeeping unit and during the time she spent in the kitchen unit.

From March 2008 to March 2010, Walker made repeated sexual advances toward Mims.  He would call her into his office several times a day and tell her that he "wanted her."   Although the language was not crude, she interpreted his comments as a sexual offer.  Walker also contacted Mims outside of work, both by phone and text message, to invite her over to his house.  Sometime after November 2009, he wrote her at least one love letter asking her to leave her husband and move in with him; in return, she was to receive a promotion to kitchen supervisor.  Finally, Mims stated that Walker implied he could protect himself against any complaints filed against him for his behavior. Mims was intimidated by Walker's behavior and tried to avoid being alone with him.

Other employees noticed Walker's inappropriate behavior toward Mims.  Karon Oliver, a secretary at

4

Chilton Medical, witnessed Walker's frequent overtures to Mims.  She noted that Walker would stand near and follow Mims very closely.  Oliver also saw a text message Walker sent to Mims that read: "Please come to my house when you get off work."

Mims was not Walker's only target.  Almost immediately upon arriving at Chilton Medical, Mims was warned by other female employees that Walker had a reputation for preying on his young female subordinates. For example, Walker had an intimate relationship with Cindy Mills, whom he had recruited to work at Chilton Medical in a method similar to Mims's experience. Mills Deposition (Doc. No. 33-29) at 4-6 & 12.

Additionally, Walker had a long-standing non-sexual dispute with Teresa Maddox.  In February 2009, Maddox filed a written complaint with Chilton Medical about Walker's behavior.  Maddox accused Walker of calling her a "bitch," being verbally abusive to other female employees, and telling a subordinate that he was going to

"spank" her when she came over to his house that evening. Maddox Complaint (Doc. No. 33-19) at 2. Maddox's complaint also noted that Walker repeatedly contacted Mims at home for non-work-related reasons and would page Mims to come to his office several times a day.

Maddox's complaint sparked an investigation by Human Resources Director Bartlett and another employee. According to the investigative report, Mims was interviewed and did not complain about Walker's behavior; instead, Mims stated that Walker contacted her outside of working hours to check-up on her.

Following the investigation, Chilton Medical's kitchen and housekeeping divisions were split, with Maddox supervising the kitchen and Walker overseeing the housekeeping unit. Maddox received a disciplinary notation in her employment record for filing the complaint. Despite a decrease in responsibilities, Walker's salary remained the same. It is unclear from

the record when and how employees were informed about the kitchen-and-housekeeping reorganization.

Around the time of the reorganization, Mims requested a transfer to the housekeeping unit, where Walker would remain her supervisor; however, Mims did not know at the time she requested the transfer that Walker would no longer have supervisory authority over the kitchen unit.

At various points in 2008 and 2009, Mims complained about Walker's behavior to Human Resources Director Bartlett. Mims showed Bartlett some of the text messages that Walker had sent her. According to Mims, Bartlett not only ignored these complaints, she deleted the incriminating text messages from Mims's phone. After these failed attempts at reporting Walker's sexual advances, Mims stopped lodging complaints with Bartlett and instead expressed her problems to co-workers.

The tension between Walker and Mims escalated in early 2010. On February 10, 2010, he sent her an

emoticon text message that she interprets as saying, "I love you." Mims did not respond to the text message.

Shortly thereafter, on February 16, 2010, Mims received negative reviews on her employee evaluation. Compared to her 2009 evaluation, she received lower or equal marks in all categories. Compare 2010 Evaluation (Doc. No. 33-4) with 2009 Evaluation (Doc. No. 33-35). The 2010 evaluation also included a handwritten notation from Walker: "Stephanie [Mims] has a problem with gossip and making fictitious statements which lead to problems with other staff members. This has to end now, by Stephanie not getting involved with the rumor mill or starting false rumors. This has been an ongoing problem that seems to be getting worse." 2010 Evaluation (Doc. No. 33-4) at 4. Bartlett asked Walker to include that notation in order to "make a documentation that there had been concerns." Bartlett Deposition (Doc. No. 33-6) at 65-66. The "rumors" that Bartlett and Walker were worried about related to Walker's sexual advances.

On February 22, 2010, as part of her housekeeping duties, Mims lifted a heavy bag of linens, causing her to experience intense pain in her abdomen.  Realizing that the bag was too heavy to lift on her own, Mims asked Mills to assist her, but Mills refused.  Mims then lifted the bag again and put it into a cart.  Mims next went to the maintenance area where she reported the injury to Walker, who laughed at her and took no further action.

After experiencing abdominal pain the following morning, Mims reported the injury to Chilton Medical nurse Angela Bachelor, who instructed her to go to Chilton Medical's emergency room.  During the examination, Mims told nurse Brenda Sherrill that she had injured her abdomen while lifting a heavy bag.  Sherrill spoke with Mills about the incident.  In notes taken that day, Sherrill recorded that Mills said that she did not witness Mims injure herself.

Because of her injury, Mims filed for worker's compensation.  Around this time, Walker asked Mills to

9

provide a written explanation of the incident; Mills asserted that she, not Mims, had lifted the heavy linen bag. Bartlett concluded upon receiving this information that Mims had lied about her injury on the worker's compensation form. Bartlett terminated Mims on March 23, 2010. The reason given in Mims's personnel file for her termination was "dishonesty and inappropriate behavior to others." Mims Personnel File (Doc. No. 33-5) at 2.

Shortly thereafter, Mims's husband went to the hospital to meet with Chilton Medical CEO Debra Richardson about Walker's harassment of Mims. Chilton Medical and SunLink Health contend that this meeting was their first notification of any potential sexual harassment by Walker against Mims. Bartlett denies that Mims made any prior complaint to her about Walker's behavior.

Following her termination, Mims filed for unemployment benefits. On May 11, 2010, Bartlett completed an "Employer Response to a Request for

Separation Information."  Bartlett indicated that Mims was discharged for the following: "Several incidents of dishonesty[.] Getting involved in starting rumors." Unemployment Form (Doc. No. 33-7).  Then, on May 14, 2010, a state unemployment investigator called Bartlett to discuss Mims's termination; Bartlett's proffered response was Mims's involvement in a verbal altercation with a co-worker.  Unemployment Form (Doc. No. 33-8). Not until the June 2010 response to Mims's filing with the Equal Employment Opportunity Commission did Bartlett explicitly cite Mims's allegedly false worker's compensation filing as the ground for the termination.

### III.  DISCUSSION

**A.  Sexual-Harassment Claim**

To establish a sexual-harassment claim under Title VII, an employee must show that: "(1) ... he or she belongs to a protected group; (2) ... the employee has been subject to unwelcome sexual harassment, such as

11

sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) ... the harassment must have been based on the sex of the employee; (4) ... the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) [there is] a basis for holding the employer liable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  In conducting this inquiry, courts must be mindful that "workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context."  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010).

Where, as here, the harasser is a supervisor, "an employer can be held vicariously liable if: (1) the employee's refusal to comply with the supervisor's sexual demands or overtures resulted in a tangible employment action being taken against her; or (2) the harassment was sufficiently severe or pervasive to alter the conditions

12

of her employment, which is known as a hostile-work-environment claim." Edwards v. Hyundai Motor Manufacturing Alabama, LLC, 603 F. Supp. 2d 1336, 1347 (M.D. Ala. 2009) (Thompson, J.).  This distinction is crucial because there is "no affirmative defense against a tangible-employment-action claim." Id.

Chilton Medical and SunLink Health make three contentions for why summary judgment on this claim is appropriate.  The court addresses each in turn.

Were Walker's Acts Based on Mims's Sex?  Chilton Medical and SunLink Health submit that Walker's behavior was not based on Mims's sex, but rather his behavior was merely bothersome and annoying.

Mims has submitted sufficient evidence to create a genuine dispute about whether Walker's comments were based on her sex.  Mims reports that Walker read her love letters and said that he "wanted her," a phrase that standing alone carries a sexual undertone.  Tellingly, Walker's contact with Mims occurred outside of normal

working hours.  <u>Cf</u>.  <u>Mendoza</u>, 195 F.3d at 1249 (finding
that there was no sexual harassment, in part, because
"[t]here is no allegation of any staring or following
[plaintiff] outside the workplace or of any calling
[plaintiff] after work"). Walker also told Mims that if
she were to leave her husband and move in with him, she
would be promoted.  A reasonable jury could conclude that
such comments and promises went beyond the bounds of a
helpful and friendly supervisor.

   <u>Was Walker's Conduct Severe or Pervasive?</u> Chilton
Medical and SunLink Health argue that Walker's behavior
was neither severe nor pervasive.  Specifically, they
contend that his behavior was not physically threatening
or humiliating.  They note that he never touched Mims
inappropriately, nor did he ever make a vulgar, explicit
demand for sex.

   "Harassment is severe or pervasive for Title VII
purposes only if it is both subjectively and objectively
severe and pervasive."  <u>Johnson v. Booker T. Washington</u>

**14**

<u>Broadcasting Service</u>, 234 F.3d 501, 509 (11th Cir. 2000). In determining whether conduct is objectively severe of pervasive, courts look to the following four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Mendoza</u>, 195 F.3d at 1246. This standard is not a "mathematically precise test" and "no single factor is required." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22-23 (1993).

A genuine question of material fact exists as to whether Walker's conduct created a hostile-work environment. As noted above, Mims felt intimidated by him and thought that her job was in jeopardy if she complained about his behavior. Walker had told Mims that he could protect himself against any complaints, and Bartlett's cover-up of Walker's text messages, if

15

confirmed, would support this assertion.  Thus, Mims felt that she had not choice but to tolerate her supervisor's advances.

Turning to whether the harassment was objectively severe or pervasive, Mims has presented sufficient evidence to reach a jury.  Walker's womanizing was a pervasive facet of Mims's work experience.  Mims has submitted evidence that he had a pattern of using his supervisory authority to seduce female subordinates and had an intimate relationship with at least one of them. Moreover, Walker consistently targeted Mims, paging her to his office frequently during the day and texting or calling her at night.  See Guthrie v. Waffle House, Inc., 2012 WL 335629, *4 (11th Cir. Feb. 3, 2012) (affirming grant of summary judgment because offensive comments were infrequent and spread out over an eleven-month period); Reeves, 594 F.3d at 804 (reversing grant of summary judgment because of obscene comments "on a daily basis").

16

Walker's conduct was also severe.  While it is true that Walker did not use obscene and derogatory language, Walker's offer of a promotion if Mims left her husband and moved in with him is particularly troubling.  The offer's bluntness underscores and informs Walker's other behavior toward Mims and reveals that otherwise potentially innocuous acts had sexual overtones.  Indeed, Mims refused the offer and she was never promoted to kitchen supervisors.  While "Title VII is not a civility code," id. at 807, it does not require a showing that supervisors use vulgar or profane language.  Title VII can be violated as much by a Casanova as by a Marquis de Sade seeking sexual favors in exchange for promotions.

Walker's conduct was humiliating and physically threatening to Mims.  Other employees were aware that Walker paged Mims to his office several times a day.  Furthermore, when Walker asked Mims to return one of his love letters, he stood between Mims and the door.  Mims felt that she did not have a choice but to return the

17

love letter.  Mims was also "afraid to be alone" with
Walker.  Mims Affidavit (Doc. No. 33-2) at ¶ 11.

Finally, Walker's behavior unreasonably interfered
with Mims's job performance.  Walker's pages to Mims to
report to his office were "for no business purpose" and
were so frequent that Mims found it difficult to complete
her daily tasks.  Id. at ¶ 23.  Co-workers confirmed the
constant paging and believed that it interfered with
Mims's ability to do her job.  Maddox Affidavit (Doc. No.
33-3) at ¶ 11.

Given these factors, the court is convinced that Mims
has established a genuine dispute as to whether Walker's
conduct was severe or pervasive.

May Chilton Medical and SunLink Health Be Held
Liable?  Finally, Chilton Medical and SunLink Health
raise an affirmative defense that Chilton Medical had a
comprehensive sexual-harassment policy and Mims did not
utilize it.  But if an "employee's refusal to comply with
the supervisor's sexual demands or overtures resulted in

a tangible employment action being taken against her,"
there is no affirmative defense available to the
employer.  <u>Edwards</u>, 603 F. Supp. 2d at 1347.  It is
axiomatic that Mims's termination qualifies as a tangible
employment action.  <u>Burlington Indus. v. Ellerth</u>, 524
U.S. 742, 761 (1998) ("A tangible employment action
constitutes a significant change in employment status,
such as hiring, firing, failing to promote, reassignment
with significantly different responsibilities, or a
decision causing a significant change in benefits.").

Here, a genuine dispute exists as to whether Mims's
rejection of Walker's advances "resulted in" her
termination.  There is a close-temporal proximity between
Walker's love letters, the negative-performance review,
the emoticon-text message, and Mims's termination.  The
"rumor mill" complaint cited in the performance
evaluation concerned Mims's comments to co-workers about
Walker's behavior.  Moreover, Mims has submitted evidence
of Bartlett's alleged cover-up of Walker's behavior,

19

thereby providing a link between Mims's rebuffs of Walker and her eventual termination by Bartlett.  Thus, a reasonable jury could find that Mims's termination was related to her rejection of Walker's sexual advances.


B.  Retaliation Claim

To make out a prima-facie retaliation claim under Title VII, a plaintiff must establish: "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007).

Chilton Medical and SunLink Health contend that Mims did not engage in statutorily protected expression because she did not inform Bartlett or any other supervisor about Walker's harassment until after she was terminated.  Mims, on the other hand, contend that she did alert Bartlett and that not only were her complaints

ignored, Bartlett helped conceal Walker's harassment by deleting the incriminating text messages.  Because there is a genuine dispute as to this material fact, summary judgment for Chilton Medical and SunLink Health is inappropriate.

Assuming that Mims reported Walker's behavior, Chilton Medical and SunLink Health submit that there is no causal relationship between Mims's termination and her complaints.  More specifically, they argue that Mims's complaints to Bartlett occurred in 2009, far too temporally separated from her termination in March 2010.

While temporal proximity is one means of establishing a causal relationship, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." EEOC v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). Mims has established a dispute as to whether her termination was in retaliation for her complaints to Bartlett and her refusal to give into Walker's sexual

overtures.   The critical handwritten notation on Mims's 2010 performance evaluation was directly related to her gossiping about Walker's advances; furthermore, Bartlett instructed Walker to make that notation on her form. Given Mims's allegations that Bartlett tried to cover up Walker's harassment, these events appear connected. Moreover, Mims's negative review occurred only a month before she was terminated.   In light of these interrelated events--Mims's complaints to Bartlett, Bartlett's instruction to Walker to give Mims a negative review, and Mims's ultimate termination--there is a genuine dispute as to whether there is a causal connection between Mims's protected activity and her termination.

Once a plaintiff establishes a prima-facie case, "the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Chilton Medical and SunLink Health contend that Mims's

dishonesty, gossiping, and false worker's compensation form satisfy this requirement; Mims does not dispute this point.

At the final stage of the Title VII retaliation inquiry, "[t]he plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Olmsted, 141 F.3d at 1460. Chilton Medical and SunLink Health assert that Mims's termination for lying on her worker's compensation form was not a pretext.

A reasonable jury could conclude that Bartlett's shifting explanations for Mims's termination, starting at a general criticism of dishonesty and becoming more specific over time as to the worker's compensation form, are evidence of a pretext. See Hulbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (commenting that "employer's failure to articulate clearly and consistently the reason for an employee's

discharge may serve as evidence of pretext"). Additionally, in light of the sexual history between Mills and Walker, a reasonable jury could also find that the Mills lied after Walker asked her to provide a written explanation for Mims's injury.


   C. SunLink Health as an Employer under Title VII

   It is undisputed that Chilton Medical, not SunLink Health, was Mims's direct employer.  But Mims contends that SunLink Health's status as Chilton Medical's parent company makes the two corporations a "single employer" under Title VII.

   "A liberal construction must be accorded to the term: employer."  <u>McKenzie v. Davenport-Harris Funeral Home</u>, 834 F.2d 930, 933 (11th Cir. 1987).  "Where two or more corporations, such as a parent and a subsidiary, are 'highly integrated with respect to ownership and operations,' the corporations may be viewed as a 'single employer' for purposes of establishing Title VII

**24**

liability."   Thornton v. Mercantile Stores Co., 13 F.
Supp. 2d 1282, 1291 (M.D. Ala. 1998) (DeMent, J.)
(quoting McKenzie, 834 F.2d at 933).   In conducting the
single-employer inquiry, courts look to several factors:
"(1) interrelation of operations, (2) centralized control
of labor relations, (3) common management, and (4) common
ownership or financial control."   McKenzie, 834 F.2d at
933.

Courts have cited the following evidence as going to
the whether two corporations have interrelation of
operations: (1) unified banking operations; (2) unified
payment of vendors; (3) parent corporation's control of
subsidiary's budget, including setting pay rates; (4)
parent corporation's control of senior employees of the
subsidiary; (5) contact between human resources
departments; (6) distribution of human-resources policies
by parent corporation to subsidiary; (7) centralized
management information services; (8) centralized risk
management functions; (9) policies which allow employment

25

transfers among subsidiaries without new paperwork; (10) centralized benefit programs such as insurance plans; and (11) parent corporation providing training to the subsidiary's employees. Thornton, 13 F. Supp. 2d at 1291.

There is evidence in the record establishing an interrelation of operations between Chilton Medical and SunLink Health. SunLink Health paid three Chilton Medical chief executive officers (the CEO, COO, and CFO) and maintained their employment files. SunLink Health exercised final control over Chilton Medical's decision-making policies. The interrelationship between SunLink Health and Chilton Medical was so strong that Larry Jeter, Chilton Medical's chief executive officer, was transferred to another SunLink Health facility in Georgia. Bartlett also conferred with human-resources employees at SunLink Health. And with regards to administrative control and policies, SunLink Health

maintained centralized risk management services and worker's compensation insurance for its subsidiaries.

Regarding labor relations, SunLink Health strived for standardization across its hospitals. For instance, SunLink Health distributed human-resources policies to its subsidiaries, including Chilton Medical. Even policies specific to Chilton Medical were approved by the CEO, a SunLink employee.

As to the third factor, shared management, SunLink Health directly paid Chilton Medical's chief executives. And as described above, SunLink exercised sufficient control over Chilton Medical management personnel to transfer one of them to another subsidiary. Finally, prior to March 2011 and at all times relevant to this litigation, SunLink Health owned Chilton Medical as a subsidiary.

SunLink Health asserts that much of Bartlett's testimony concerns SunLink Healthcare, LLC, not SunLink Health Systems, Inc., the named defendant. But

27

Bartlett's testimony about the difference between the two companies is ambiguous.  <u>See</u> Bartlett Deposition (Doc. No. 51-1) at 12 ("Q: When you refer to Sunlink corporate, are you referring to Sunlink Healthcare, LLC?  A: I guess so, yes.  I don't know for sure.").  Given the similarities in names between the two corporations and the fact that SunLink Healthcare, LLC, is a subsidiary of defendant SunLink Health, Bartlett's uncertainty is understandable.  To the extent that there is a dispute as to whether Chilton Medical's relationship was closer to SunLink Healthcare, LLC or defendant SunLink Health, this is a genuine dispute of material fact to be resolved at trial.

*   *   *

Accordingly, it is ORDERED that the motions for summary judgment filed by defendants SunLink Health Systems, Inc. (Doc. No. 27) and Chilton Medical Center (Doc. No. 28) are denied.

DONE, this the 2nd day of March, 2012.

      <u>  /s/ Myron H. Thompson  </u>
      UNITED STATES DISTRICT JUDGE